## HARTZELL v. UNITED STATES.

(District Court, S. D. Illinois. December 24, 1897.)

INTERNAL REVENUE — SPECIAL TAXES — WHAT CONSTITUTES DEALER IN OLEOMARGARINE.

A merchant does not become a dealer in oleomargarine, and subject to special tax as such, by permitting packages ordered by an hotel keeper from a wholesale house, through its salesman, to be shipped in his name, simply as an accommodation, and as a guaranty that the price would be paid, where he had no part in making the sales, and received no profit thereon.

This was a petition filed by Judd O. Hartzell to recover special taxes assessed against him as a wholesale dealer in oleomargarine, and paid under protest. The United States demurred to the petition.

Geo. Edmunds and O'Harra, Scofield & Hartzell, for petitioner.
J. O. Humphrey, for the United States.

ALLEN, District Judge.    Judd O. Hartzell filed his petition on the 16th day of November, 1895, duly sworn to, in the United States district court, asking for judgment against the United States for an internal revenue tax as dealer in oleomargarine, which he alleges was improperly assessed against him.    The petitioner states:

That about the 1st of March, 1894, he was notified by J. L. Wilcox, collector of internal revenue for the Eighth collection district, at Springfield, Ill., that an assessment had been made against him as a wholesale dealer in oleomargarine at Laharpe; that the amount of the taxes so assessed, under the internal revenue laws of the United States, was $160 for the 4 months ending June 30, 1893, and $480 for the 12 months ending June 30, 1894; that said taxes, with the penalty, amounted to $960; and that said collector demanded payment thereof, and notified petitioner that, if it was not paid, the collector would proceed to distrain and sell property of petitioner.    Upon receiving this notice, petitioner prepared evidence, in the form of affidavits, and presented the same to said Wilcox, as such collector, showing that petitioner was not, and had not been, a dealer in oleomargarine.    That these affidavits not then being in petitioner's possession (having been forwarded to Washington City), petitioner was unable to give a copy of the same, but they were substantially the same as Exhibits A and B, filed with the petition.    And petitioner thereupon asked that the assessment be vacated, abated, and set aside, but his said request was refused.    Upon such refusal, petitioner appealed to the commissioner of internal revenue, at Washington, D. C., and presented to him proof showing the fact, fully, that petitioner had never dealt in oleomargarine, and made exhibits of such proof, and asked said commissioner to set aside, vacate, and abate said assessment, which request was refused by said commissioner, and petitioner informed he must pay the tax and penalties thereon, and, if he desired redress, he must seek the same in court.    That petitioner thereupon paid to said Wilcox, as such collector, under protest, the sum of $960, in full of said assessment and penalties required by said collector to be paid, on the 30th day of November, 1894.    Petitioner then made application to said collector to refund to him said $960, tax and penalty exacted of him, and which he was required to pay under protest, as aforesaid.    That the same was not refunded by said collector.    Afterwards, in due time, petitioner took and made an appeal to the commissioner of internal revenue, according to the provisions of the law in that regard, and the regulations of the secretary of the treasury established in pursuance thereof, and furnished, upon blanks provided by said commissioner, the facts and circumstances in the case.    That said appeal was taken in December, 1894, and the matter was pending before said commissioner until the spring of 1895, when a decision was rendered by said commissioner adverse to petitioner.

The petition further alleges that the substantial and material facts were:

That he was running a general store at Laharpe, a town of about 1,500 inhabitants, in Hancock county, Illinois, but that he never handled oleomargarine, in any manner.    That an hotel keeper in said town of Laharpe (Harry Owens) wanting some oleomargarine for use in his hotel, applied to one Charles Clark, the traveling salesman of the wholesale grocery house of Reid, Murdock & Fisher, of Chicago, and who stopped at the hotel of said Owens when in Laharpe, on his regular trips, selling goods to merchants of Laharpe.    That said Clark contracted with said Owens for one tub of oleomargarine.    That after said order had been taken by said Clark from said Owens, and they had agreed upon the price and quantity, said Clark and Owens came to petitioner's store, and said Owens, in the presence of said Clark, stated to petitioner that he had bargained for a tub of oleomargarine from said Clark; but that he had no rating with said Clark's house, of Reid, Murdock & Fisher, and asked petitioner, in the presence of said Clark, to permit him

to have said oleomargarine shipped to him in the name of said petitioner. That said Clark thereupon assured petitioner that by so doing he would not incur any liability as a dealer in oleomargarine, but would simply be a guarantor for said Owens that he would pay for the same. That, with that understanding, petitioner consented that said tub of oleomargarine might be shipped in his name to said Owens. That said tub came billed and charged in petitioner's name, but was received and paid for by said Owens, and never was in any manner entered on petitioner's books, or became any part of his stock of goods. That said Owens afterwards, on two or three different occasions, ordered a tub of oleomargarine from said Clark. That all of said tubs contained about forty pounds, and each order was made by said Owens, and he ordered the oleomargarine for his own use, and the same was used by him in his hotel, and he so ordered the same by agreement between him and said Clark; petitioner, as a matter of accommodation to said parties, simply consenting that the same might be billed in petitioner's name to said Owens, and each tub was shipped in petitioner's name, the same as the first tub. That petitioner long afterwards learned, but did not then know, that said Reid, Murdock & Fisher did not have said oleomargarine in stock, but obtained the same from Armour & Co., of Chicago, and had that company ship the same, but that it was billed out to Owens in the name of petitioner by said Reid, Murdock & Fisher, and petitioner supposed that it was shipped by them. It was received by said Owens under his said agreement with said Clark, and paid for by said Owens. That afterwards said Owens in like manner purchased from one Pierce, a traveling salesman for Armour & Co., of Chicago, who also stopped with said Owens at his hotel on trips through the county selling goods, a tub of oleomargarine, of about the same size. That he purchased the same of said Pierce in the same way, and under a like agreement had with said Clark. That the same was shipped and billed to said Owens in the name of petitioner at the request of said Owens and Pierce, for the reason, as given by them, that said Owens had no rating with Armour & Co., and that petitioner would thereby become surety for the payment of the same. That petitioner never bought any oleomargarine of said Armour & Co., or any other person, for himself, or for the purpose of dealing in the same, or keeping it in stock, or trading in it, as a wholesale or retail dealer. That his name was simply used by said Owens and said traveling salesman and their said house, at their request, for the purpose aforesaid, and without any intention on the part of your petitioner to handle oleomargarine, or become a dealer therein. That altogether there were nine tubs, of about forty pounds each, sold to said Owens, and shipped and billed in the name of petitioner, including the sales made by both Clark and Pierce. The first tub was shipped about the last of February. 1893, and it was, if petitioner recollects correctly, all shipped between that date and June 30th following, except about two tubs which were shipped some time in June or July. That this is the only oleomargarine that petitioner, or his name, was ever connected with in any manner whatsoever, and that this was all sold to said Owens, and was shipped and billed in the name of petitioner. That most of it was received and taken from the freight depot in Laharpe direct to Owens' hotel. A few tubs may have been brought by freight haulers to petitioner's store, but, if so, it was taken immediately from there to Owens' hotel; and none of it was ever examined or inspected or seen by petitioner, and he knew nothing whatever about it, further than already stated. None of it was ever handled or carried in stock by petitioner, or sold or dealt in by him. Petitioner never at any time, directly or indirectly, dealt in oleomargarine, and never at any time had anything to do with the same, except as before set forth. That what he did then in connection with said nine tubs was done at the request of said parties, and as the agent of said Owens, and to accommodate him and said Clark and said Pierce, and their said wholesale houses. That said Clark and Pierce were general traveling salesmen for said wholesale houses, and each of them had a full knowledge of all the facts at the time said oleomargarine was sold to said Owens, and shipped to him in petitioner's name. That petitioner was never promised any remuneration, and never made any charge, and never at any time, directly or indirectly, received any profit or commission on said oleomargarine, and never at any time expected to or attempted

to receive any profit, commission, reward, or remuneration. That, in consenting that his name might be used, he did so solely for the accommodation of all parties, and for no other purpose whatsoever, and wholly without reward or remuneration.

To this petition the United States district attorney has interposed a general demurrer, and, such demurrer, under well-settled rules, admitting the truth of all facts well pleaded, the question arises, do the facts alleged in the petition entitle the petitioner to relief in this court?

It is provided in the United States statutes on the subject of internal revenue, relative to suits for recovery of taxes wrongfully collected (Rev. St. 1878 [2d Ed.] p. 619, § 3226), that:

"No suit shall be maintained in any court for the recovery of any internal tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until appeal shall have been duly made to the commissioner of the internal revenue, according to the provisions of law in that regard, and the regulations of the secretary of the treasury established in pursuance thereof, and a decision of the commissioner has been had therein; provided, that if such decision is delayed more than six months from the date of such appeal, then the said suit may be brought, without first having a decision of the commissioner, at any time within the period limited in the next section."

Full compliance with the foregoing section is averred in the petition.

Section 2, p. 559, of the Supplement to the Revised Statutes of the United States of 1874-91 provides:

"That the district courts of the United States shall have concurrent jurisdiction with the court of claims as to all matters named in the preceding section where the amount of the claim does not exceed one thousand dollars."

All the necessary allegations required by section 5, p. 560, of the Supplement to the Revised Statutes of the United States are also contained in the petition. Indeed, it has not been contended in support of the demurrer that the petition is subject to technical objection; but it is strenuously insisted that the substantial facts and circumstances set up in the pleading make the petitioner, Hartzell, a wholesale dealer in oleomargarine. The authorities cited in support of this position do not seem to sustain it. They are mainly liquor cases, under the internal revenue law, and establish fully the doctrine that one sale constitutes the party making it a dealer. This is unquestionably the rule, at least in this circuit, and would apply equally to the sale of oleomargarine. But do the facts set up in the petition, and admitted, for the purposes of the inquiry, to be true, show a sale of oleomargarine by Hartzell to Owens, or to any other person? Owens was an hotel keeper in the town of Laharpe. Clark was a traveling salesman for Reid, Murdock & Fisher, of Chicago. Hartzell was a merchant living and doing business also in Laharpe. Owens wanted a tub of oleomargarine to use at his hotel. Clark, the traveling man, stopping with Owens when in Laharpe, wanted to sell it to him. The terms were agreed upon, but, Owens having no rating with Clark's house, it became necessary to give some security for the payment of the price. The parties, Owens and Clark, went together to Hartzell, who agreed that the oleomargarine

might be shipped in his name, and that he would stand good for the purchase money, but expressly stipulated that he was not to receive or handle, or have anything to do with, the goods, except to see that Owens paid for them. It turned out that Reid, Murdock & Fisher, in Chicago, did not handle oleomargarine, or at least did not then have it in stock, but went to Armour & Co., Chicago manufacturers, and had it shipped to Owens in the name of Hartzell. Several tubs were shipped under the same circumstances. Afterwards Pierce, a traveling salesman for Armour & Co., who also stopped at the hotel kept by Owens, solicited and secured orders for oleomargarine from Owens under precisely the same circumstances and conditions existing at the time he purchased from Clark. In all, nine tubs were shipped to Owens in Hartzell's name, who received and paid for the same, including the freight, and used it in his hotel. Hartzell's act was that of a mere agent of Owens. He simply agreed to guaranty payment of the price of the oleomargarine, stipulating at the time that he was to have nothing to do in handling or caring for it. In no event was he to receive one cent of gain or profit out of the transaction. Was there any sale of the oleomargarine by Hartzell to Owens? In section 243 of Benjamin on Sales it is said:

"But then, in some cases, a broker, though acting as agent for a principal, makes a contract of sale and purchase in his own name. In such case he may be sued by the party with whom he has made such contract, for a nonfulfillment of it. But so, also, may his undisclosed principal; and, although the agent may be liable upon the contract, yet I apprehend nothing passes to him by the contract. The goods do not become his. He could not hold them, even if they were delivered to him, as against his principal. He could not, as it seems to me, in the absence of anything to give him a special property in them, maintain any action in which it was necessary to assert that he was the owner of the goods. The goods would be the property of his principal, and although two persons, it is said, may be liable on the same contract, yet it is impossible that two persons can each be the sole owner of the same goods. Although the agent may be held liable, as a contractor, on the contract, he still is only an agent, and has acted only as agent. He could not be sued, as it seems to me, merely because he had made the contract of purchase and sale in his own name with the vendor, even though the contract should be in a form which passes property in goods by the contract itself by a third person, as if he (the broker) were the owner of the goods; as if, for instance, the goods were a nuisance or an obstruction, or, as it were, trespassing, he would successfully answer such an action by alleging that he was not the owner of the goods, and by proving that they were the goods of his principal, till then undisclosed. If he could not be sued for any other tort merely on the ground that he had made the contract in his own name with the vendor, it seems to me that he cannot be successfully sued merely on that ground by the real owner of the goods as for a wrongful conversion of the goods to his own use."

If the position should be assumed that there was no agency existing between Owens and Hartzell, unless knowledge of that agency should be shown to Armour & Co. and to Reid, Murdock & Fisher, the answer is a ready and complete one,—that they had such notice through their traveling salesmen, their agents, who respectively called upon Owens, and they together agreed upon the price and terms, and, after the price and terms had been agreed upon, then the matter was submitted to Hartzell, as alleged in the petition.

The knowledge of their traveling men, agents of Reid, Murdock & Fisher and of Armour & Co., is notice to their principal. "The general doctrine that the knowledge of an agent is the knowledge of the principal cannot be doubted." Hoover v. Wise, 91 U. S. 308, and cases there cited. It is conceded that the laws of the United States should be liberally construed, for the government, against all who attempt to commit fraud, or thwart the purpose and duty to collect revenue. But in this case, according to the petition, there was no bad purpose on the part of Hartzell or any one else. Nor was there anything in the transaction wearing the appearance of evil. The manufacturers of the oleomargarine, Armour & Co., had paid the special tax, $480, becoming wholesale dealers, and had a perfect right to sell the goods, of their own production, and at the place of manufacture, in the original packages, without paying any other tax. 1 Supp. Rev. St. (2d Ed.) p. 505, § 3. Under this statute, Armour & Co., manufacturers and wholesale dealers, through their agents, did sell, in all, nine packages of oleomargarine to Owens, shipping the same in the name of petitioner, Hartzell; but Hartzell, according to the petition, never had any such connection with same as made him a dealer; and the demurrer must be overruled.